UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

KATHRYN GRAY,                          )
                                       )
                Plaintiff,             )
                                       )
        v.                             )        No.  4:11CV72 FRB
                                       )
MICHAEL J. ASTRUE, Commissioner        )
of Social Security,                    )
                                       )
                Defendant.             )


**MEMORANDUM AND ORDER**

        This cause is before the Court on appeal of an adverse

ruling of the Social Security Administration.   All matters are

pending before the undersigned United States Magistrate Judge, with

consent of the parties, pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

        On August 8, 2008, plaintiff Kathryn Gray filed an

application for Disability Insurance Benefits pursuant to Title II

of the Social Security Act, 42 U.S.C. §§ 401, et seq.; and an

application for Supplemental Security Income pursuant to Title XVI

of the Act, 42 U.S.C. §§ 1381, et seq., in which she claimed she

became disabled on March 13, 2008.   (Tr. 115-22, 112-14.)[1]

---

        [1]On prior applications for Disability Insurance Benefits and
Supplemental Security Income, plaintiff obtained a fully favorable
decision finding her to be disabled as of August 27, 1996, due to
bipolar disorder and panic disorder.  (Tr. 53-60.)  Plaintiff's
benefits ceased in November 2002 when it was determined that
medical improvement had occurred.  (Tr. 137-38.)  In the instant
cause of action, plaintiff does not challenge this cessation of
benefits.

Plaintiff subsequently amended her onset date to November 30, 2008. (Tr. 317.) On initial consideration, the Social Security Administration denied plaintiff's claims for benefits. (Tr. 61, 62, 64-70.) On October 29, 2009, a hearing was held before an Administrative Law Judge (ALJ) at which plaintiff testified and was represented by counsel. A vocational expert also testified at the hearing. (Tr. 21-52.) On February 12, 2010, the ALJ issued a decision denying plaintiff's claims for benefits. (Tr. 6-17.) On November 13, 2010, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-4.) The ALJ's decision is thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

A. <u>Plaintiff's Testimony</u>

At the hearing on October 29, 2009, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was forty-two years of age. Plaintiff completed high school and received additional vocational training as a secretary and as a manicurist. Plaintiff is divorced and lives with three of her children, ages fourteen, eleven and nine. (Tr. 28-29.) Plaintiff receives food stamps and Medicaid assistance. Plaintiff testified that she receives financial help from her mom and oldest son, as well as from church organizations. (Tr. 37-38.)

Plaintiff's Work History Report shows plaintiff to have

worked as a secretary at a college from November 1994 to May 1995. From June 1996 to August 1996, plaintiff worked as an office manager for a not-for-profit agency. From November 1998 to May 1999, plaintiff worked as a manicurist/receptionist at a beauty spa. From May 1999 to November 1999, plaintiff worked as an administrative assistant through a temporary employment agency. From November 1999 to January 2000, plaintiff worked as a manicurist at a beauty spa. From January 2001 to April 2001, plaintiff worked as a boutique coordinator for a not-for-profit agency. From April 2001 to July 2001 and from February 2007 to October 2007, plaintiff worked as a manicurist at a beauty spa. Plaintiff worked as a mail carrier from October 2007 to March 2008. (Tr. 169.) Plaintiff testified that she then worked at Macy's for three or four months, but left that job because of depression. (Tr. 35-36.) Plaintiff testified that she last worked from June 2009 to September 2009 in a nail salon but lost that job because of an onset of depression. (Tr. 35.) Plaintiff testified that she served in the National Guard for six years, during which she trained once a month on weekends. Plaintiff testified that she was honorably discharged in November 2008. (Tr. 39.)

Plaintiff testified that she is unable to work because of depression and anxiety from which she has suffered since she was eighteen years of age. (Tr. 38.) Plaintiff testified that her work history is sporadic because of her depression and anxiety.

Plaintiff testified that she is fine for periods of time during which she can work, but that she then experiences episodes of depression and anxiety during which time she cannot go to work. Plaintiff testified that she has lost jobs because of crying spells and not being able to perform to the expectations of her employers. (Tr. 34.)

Plaintiff testified that she currently receives treatment for depression from Dr. Sriram. Plaintiff testified that she has been with Dr. Sriram for two months and that he prescribes medication and provides counseling. Plaintiff testified that she takes Celexa and Abilify for her depression and Ambien to help her sleep. Plaintiff testified that her medications cause her to feel nauseous and to have a loss of appetite. Plaintiff testified that the medication helps when her symptoms are not severe, but that she experiences bouts of depression where she loses interest, has no energy and does not leave the house. Plaintiff testified that her most recent episodes were in September and June 2009 and lasted one and a half to two weeks. (Tr. 30-33.)

Plaintiff testified that she also suffers from anxiety. Plaintiff testified that her bouts of depression follow her episodes of anxiety. Plaintiff testified that she used to take Xanax for anxiety but that her doctor stopped prescribing the medication because it did not help her condition. (Tr. 33.)

Plaintiff testified that she has experienced six bouts of

depression within the previous twelve months, with some episodes lasting up to three weeks.  Plaintiff testified that during such bouts, she usually stays in bed and sleeps.  Plaintiff testified that she will sometimes get dressed and will get out of bed to use the bathroom.  (Tr. 36-37.)  Plaintiff testified that during such episodes, her children get themselves ready for school.  (Tr. 34.)  Plaintiff testified that when not experiencing a bout of depression, she is functional such that she is able to get her children ready for school, look for part-time work, and go shopping.  (Tr. 37.)

As to her daily activities, plaintiff testified that she has a driver's license but does not drive because she does not have a vehicle.  Plaintiff attends church, but has no hobbies nor engages in any other activities outside her home.  (Tr. 29-30.)

B.  Testimony of Vocational Expert

Jenifer Teixeira,[2] a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

Ms. Teixeira classified plaintiff's past work as a customer service representative and administrative clerk as light and semi-skilled; as a secretary and office manager as sedentary and skilled; as a manicurist and dock clerk as sedentary and semi-skilled; and as a mail carrier as medium and semi-skilled.  (Tr. 43-

---

[2]The transcript of the hearing shows the scrivener to have referred to Ms. Teixeira phonetically as Ms. "Toshida."  (See Tr. 23.)  The ALJ's written decision correctly spells Ms. Teixeira's name, as reflected in her curriculum vitae.  (Tr. 9, 106-11.)  In this Memorandum and Order, the undersigned uses the correct spelling of the vocational expert's name, Ms. Teixeira.

44.)

The ALJ then asked Ms. Teixeira to assume an individual of plaintiff's age, education and work experience, and to further assume such individual to be

> able to perform work at all exertional levels, except for, she needs to do simple, routine, repetitive tasks in a low stress job environment including occasional, only occasional decision-making and occasional changes in a work setting. She has no, she should have no interaction with the public and only occasional interaction with co-workers.

(Tr. 44.)

Ms. Teixeira testified that such a person would not be able to perform any of plaintiff's past relevant work inasmuch as such work involved interaction with the public. Ms. Teixeira testified that such a person could perform work as an office helper, which was light and unskilled. Ms. Teixeira testified that 550 such jobs existed in the St. Louis area; with 1,760 in the State of Missouri and 100,820 nationally. Ms. Teixeira also testified that such a person could perform work as mail clerk, which was light and unskilled. Ms. Teixeira testified that 2,070 such jobs existed in the St. Louis area; with 3,600 in the State of Missouri and 138,990 nationally. Finally, Ms. Teixeira testified that such a person could also perform work as a linen room attendant, which was medium and unskilled. Ms. Teixeira testified that 14,670 such jobs existed in the St. Louis area; with 30,400 in the State of Missouri and

1,817,650 nationally.  (Tr. 44-45.)

Plaintiff's counsel then asked Ms. Teixeira to consider a person of plaintiff's age, education and work experience, and to further assume that such a person would have periods of depression for two to three weeks at a time during which she would miss work, and that such periods happened with such frequency as testified by plaintiff.  Ms. Teixeira testified that such a person would be precluded from employment.  (Tr. 50.)

### III.  Medical Records

Plaintiff was admitted to the emergency room at St. Joseph Hospital West on September 29, 2007, complaining of a recent onset of anxiety.  Plaintiff reported that the anxiety came on with her loss of employment, and that she felt symptoms in her neck and shoulders.  Plaintiff described her pain as "tightness" and rated it at a level seven on a scale of one to ten.  Plaintiff denied any suicidal or homicidal ideation.  Plaintiff's history of anxiety was noted.  Physical examination showed mild tenderness in the paracervical and trapezius areas but was otherwise unremarkable. Plaintiff was oriented times three and had normal affect.  It was noted that plaintiff was not in acute distress.  Plaintiff was diagnosed with anxiety and cervical strain.  Plaintiff was given

prescriptions for Anaprox[3] and Flexeril[4] and was discharged that same date in stable condition.  (Tr. 251-56.)

On March 11, 2008, plaintiff was admitted to the emergency room at St. Joseph Hospital West with complaints of body aches, chills, fever, and vomiting.  It was noted that plaintiff currently took no medication.  Plaintiff made no psychological complaints. It was noted that plaintiff came home from work the previous day with the stated symptoms.  Plaintiff was diagnosed with viral syndrome and was given medication for the symptoms.  Plaintiff was discharged that same date in improved condition.  Plaintiff was given a work excuse for the next two days.  (Tr. 257-63.)

Plaintiff was admitted to the emergency room at St. Joseph Hospital West on June 8, 2008, with complaints of anxiety, including shaking and heart pounding.  It was noted that plaintiff had previously been diagnosed with panic disorder with agoraphobia. Plaintiff reported that she did not sleep well the previous night and awoke with a headache.  Plaintiff reported having increased symptoms of anxiety during the day when the effects of borrowed medication wore off and upon receiving a stressful telephone call from her mother.  Plaintiff reported having ongoing stress with

---

[3]Anaprox is used to relieve pain due to various causes. Medline Plus (last revised Feb. 15, 2012)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a681029.html>.

[4]Flexeril is a muscle relaxant used to relieve pain and muscle discomfort.  Medline Plus (last revised Oct. 1, 2010)<http:// www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html>.

financial and family issues.  It was noted that plaintiff just began a new job and was raising five children, including one grown and out of the house.  Plaintiff reported having anxiety, stress, panic attacks, and nervousness.  Plaintiff denied depression.  Physical examination was unremarkable.  Plaintiff's mood and affect were noted to be normal.  Plaintiff was prescribed Xanax[5] and was discharged that same date.  (Tr. 235-39.)

Plaintiff went to the emergency room at St. Joseph Hospital West on July 2, 2008, after being involved in a motor vehicle accident.  Plaintiff's history of depression and anxiety was noted.  It was noted that plaintiff was taking Xanax for anxiety.  Plaintiff complained of left arm, hip and shoulder pain.  X-rays of the lumbar spine and left humerus were negative.  Plaintiff was given Anaprox, Flexeril and Hydrocodone[6] and was discharged that same date.  (Tr. 240-47.)

Plaintiff went to the emergency room at St. Joseph Hospital West on July 25, 2008, but left without being seen.  (Tr. 249.)

Plaintiff visited St. Luke's Urgent Care on July 25, 2008, and complained of having symptoms of anxiety for three or four days.

---

[5]Xanax is used to treat anxiety disorders and panic disorder. Medline Plus (last revised Nov. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684001.html>.

[6]Hydrocodone is used to relieve moderate to severe pain. Medline Plus (last revised July 18, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html>.

It was noted that plaintiff was having social problems and was living in a hotel with her four children. Plaintiff was noted to be depressed and tearful. Plaintiff reported having similar symptoms in the past but never this severe. Plaintiff complained of having chills and difficulty breathing. It was noted that plaintiff took no medications. Physical examination was unremarkable. Plaintiff was diagnosed with anxiety/depression and was prescribed Xanax. Plaintiff was instructed to follow up at Crider Center the following week. (Tr. 226-33.)

On September 8, 2008, plaintiff underwent a consultative psychological evaluation for disability determinations. Plaintiff reported to Dr. David A. Lipsitz that her primary complaint was generalized anxiety and panic disorder. Plaintiff reported that she had suffered from anxiety for as long as she could remember, but recently began experiencing panic attacks two to three months prior. Plaintiff reported that she has panic attacks two to three times a week and that nothing in particular precipitates the attacks. Plaintiff reported waking with her heart beating fast and with shortness of breath. Plaintiff reported that she stays home and sleeps a lot. Plaintiff reported her moods not to be good in that she is in crisis with her family and is about to lose their home. Plaintiff reported getting very depressed and that she recently experienced weight loss, loss of energy and fluctuating interest levels. Plaintiff reported having chronic insomnia, stating that

she was able to sleep only about two hours at a time.  Plaintiff reported having visited the Crider Center on one occasion for medication management.  Plaintiff reported not having seen a therapist or received any counseling.  Dr. Lipsitz noted plaintiff to be taking Wellbutrin.[7]  Dr. Lipsitz noted plaintiff's medical history for mental impairments to date back to 1986; that she had been diagnosed with depression, anxiety, panic attacks, and bipolar disorder; and that plaintiff had been hospitalized, had received outpatient therapy, and had visited psychiatrists in the past.  It was noted that plaintiff's most recent treatment was at St. John's Mercy Medical Center in 2007 on an outpatient basis.  Mental status examination showed plaintiff to be in some acute distress.  Plaintiff was oriented times three and there was no evidence of active psychotic functioning.  Plaintiff's mood was depressed and her affect was flat.  There was no evidence of active suicidal or homicidal ideation.  Plaintiff's intellectual functioning was noted to be average to high average.  Plaintiff showed no memory problems for recent or remote events.  Plaintiff's concentration was noted to be fair, and insight and judgment were noted to be good.  Dr. Lipsitz noted plaintiff's thought processes to be preoccupied with her anxiety, insecurity, panic attacks, and inability to function within society.  Dr. Lipsitz diagnosed plaintiff with major

---

[7]Wellbutrin (Bupropion) is used to treat depression.  <u>Medline Plus</u> (last revised Oct. 1, 2009)<<u>http://www.nlm.nih.gov/</u> medlineplus/druginfo/meds/a695033.html>.

depression-recurrent, and generalized anxiety disorder with panic attacks. Dr. Lipsitz questioned the presence of bipolar disorder. Dr. Lipsitz assigned plaintiff a Global Assessment of Functioning (GAF) score of 49.[8] Dr. Lipsitz noted that plaintiff was able to handle her financial affairs in a satisfactory manner and was able to remember and understand instructions. Dr. Lipsitz also noted, however, that plaintiff had some difficulty sustaining concentration and persistence with tasks, and had severe difficulty interacting socially and adapting to her environment. Dr. Lipsitz concluded that plaintiff had marked limitations in the areas of daily activities and maintaining social functioning; and mild to moderate limitations in the area of concentration, persistence or pace. As to whether plaintiff experienced repeated episodes of deterioration in a work-like setting, Dr. Lipsitz noted such to be unknown. Dr. Lipsitz concluded that plaintiff was "certainly in need of ongoing psychiatric treatment combining medication with individual psychotherapy." (Tr. 268-73.)

On September 22, 2008, Dr. Robert Cottone, a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form (PRTF) in which he opined that plaintiff's

---

[8]A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000). A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

major depression and generalized anxiety disorder with panic attacks resulted in mild restrictions of activities of daily living, and moderate restrictions in maintaining social functioning and in maintaining concentration, persistence or pace. Dr. Cottone opined that plaintiff experienced no repeated episodes of decompensation of extended duration. (Tr. 274-85.)

In a Mental Residual Functional Capacity (RFC) Assessment completed that same date, Dr. Cottone opined that in the domain of understanding and memory, plaintiff suffered marked limitations in her ability to understand and remember detailed instructions, but experienced no significant limitations in her ability to understand and remember very short and simple instructions and in her ability to remember locations and work-like procedures. In the domain of sustained concentration and persistence, Dr. Cottone opined that plaintiff suffered marked limitations in her ability to carry out detailed instructions. Dr. Cottone opined that plaintiff suffered moderate limitations in her ability to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Cottone opined that plaintiff experienced no significant limitations in her ability to carry out very short and simple instructions; to

perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and to sustain an ordinary routine without special supervision. In the domain of social interaction, Dr. Cottone opined that plaintiff experienced moderate limitations in her ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. Dr. Cottone opined that plaintiff experienced no significant limitations in her ability to ask simple questions or request assistance, or to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. Finally, with respect to the domain of adaptation, Dr. Cottone opined that plaintiff experienced no significant limitations in any regard. Dr. Cottone concluded that plaintiff was capable of performing the basic mental demands of competitive, unskilled work and that limited social contact would be less stressful for her. (Tr. 286-88.)

On February 5, 2009, plaintiff visited Dr. Dan Haupt of BJC Behavioral Health. Plaintiff reported that she had been trying to see a psychiatrist. Dr. Haupt noted plaintiff's history of generalized anxiety disorder and depression. Plaintiff reported that she first needed to see a psychiatrist when she was twenty-one years of age and suffered post-partum depression after the birth of her first son. Plaintiff reported that she first received

medication when she was twenty-six years of age with another episode of post-partum depression, and that she was subsequently diagnosed with bipolar disorder in 1996. Plaintiff reported a previous hospitalization in 2000 and that she visited psychiatrists from 2000 to 2002, and in 2006. Plaintiff also reported a recent visit to an emergency room in January 2009 whereupon she was given Clonazepam.[9] Plaintiff's current medications were noted to be Bupropion and Clonazepam. Plaintiff reported that she currently felt fearful, uncomfortable at home, agitated, and tense. Plaintiff reported that she had decreased appetite, was sleep deprived, and experienced tachypnea and shaking. Plaintiff reported that she sometimes had suicidal thoughts, thinking that her children would be better off without her. It was noted that plaintiff was currently homeless and was living in a domestic violence shelter with her three youngest children. It was noted that, despite these conditions, plaintiff attended classes at Sanford Brown Business School and worked twenty hours a week in a work-study program. Mental status examination showed plaintiff to be neatly dressed and to have good eye contact. Plaintiff was noted to be tearful. Plaintiff's flow of thought was coherent, logical and goal directed, but her mood was noted to be afraid. Plaintiff's affect was noted to be restricted to low, but appropriate. Dr. Haupt diagnosed plaintiff with major depressive

---

[9]Clonazepam (Klonopin) is used to relieve panic attacks. Medline Plus (last revised July 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html>.

disorder and generalized anxiety disorder. Dr. Haupt assigned a GAF score of 50. Dr. Haupt instructed plaintiff to continue with Bupropion and to discontinue Clonazepam. A plan was developed with plaintiff's case worker to find transitional housing for plaintiff. Plaintiff was instructed to return for follow up in one week. (Tr. 302-06, 315-16.)

Plaintiff returned to Dr. Haupt on February 14, 2009, and complained of continued anxiety, poor sleep and decreased mood. Dr. Haupt noted plaintiff's depression and anxiety to be exacerbated by plaintiff's chronic sleep disturbance due to living in a shelter. Dr. Haupt noted plaintiff to be hopeful inasmuch as she secured an apartment for April. Dr. Haupt instructed plaintiff to talk to her children regarding her mental diagnoses and about their homelessness. Mental status examination showed plaintiff to be alert, pleasant, neatly groomed, and to have good eye contact. Plaintiff denied any suicidal or homicidal ideation. Plaintiff was noted to be goal directed. Plaintiff's mood was noted to be weary and her affect was restricted to low. Dr. Haupt prescribed Citalopram[10] and Trazodone[11] and instructed plaintiff to return for follow up in two weeks. (Tr. 314.)

---

[10]Citalopram (Celexa) is used to treat depression. <u>Medline Plus</u> (last revised Feb. 15, 2012)<<u>http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html</u>>.

[11]Trazodone is used to treat depression, insomnia and anxiety. <u>Medline Plus</u> (last revised Aug. 1, 2009)<<u>http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html</u>>.

On March 5, 2009, plaintiff met with a licensed clinical social worker at BJC Behavioral Health for initial clinical assessment. It was noted that plaintiff originally sought services from Crider Center but was discharged prior to intake when she moved to the City of St. Louis. Plaintiff reported that she currently experienced crying spells for no reason, had feelings of hopelessness, difficulty sleeping, lack of appetite, and constant worry on a daily basis. Plaintiff reported that the stress of being homeless triggered her symptoms, and that she had difficulty functioning during the day. Plaintiff reported not having suicidal ideation but that she had passive thoughts of wanting to give up. Plaintiff's mental health history was reviewed, as well as plaintiff's social, familial and employment history. Mental status examination showed plaintiff's flow of thought to be coherent, logical and goal directed. Plaintiff's mood was noted to be sad and her affect was depressed and occasionally tearful. Plaintiff's estimated intellect was noted to be average. Plaintiff was diagnosed with major depressive disorder, recurrent, without psychotic features; and generalized anxiety disorder. Plaintiff was assigned a GAF score of 60.[12] Plaintiff's prognosis was noted to be good "as long as she maintains compliance and is able to secure

_____

[12]A GAF score of 51 to 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000).

stable housing." Recommendations were made for plaintiff to continue with Dr. Haupt, to seek general medical check ups, to work with available staff to resolve housing issues, to seek legal assistance for her disability appeal, to continue to attend classes and participate in work-study, to meet with a counselor, to apply for Medicaid and other entitlements, and to consider participating in volunteer activity. (Tr. 291-301.)

On March 10, 2009, plaintiff met with Clinical Social Worker Lindsay E. Brown at BJC Behavioral Health for purposes of establishing a treatment and rehabilitation plan. It was noted that plaintiff's goals were to secure housing and a full time job. Ms. Brown noted plaintiff's diagnoses to be major depressive disorder-recurrent and generalized anxiety disorder. Plaintiff's current GAF score was noted to be 50. A plan was put in place whereby assistance would be provided to plaintiff on a weekly basis. (Tr. 307-09.)

Plaintiff returned to Dr. Haupt on April 7, 2009, who noted plaintiff to be living on her own in an apartment and to have decreased anxiety. Plaintiff continued to be depressed because of her job situation. Mental status examination showed plaintiff to be tearful but to have good eye contact. Plaintiff denied any suicidal or homicidal ideation. Plaintiff's flow of thought was noted to be coherent and logical. Plaintiff's mood was noted to be fine and her affect sad. Plaintiff had good insight and judgment.

Dr. Haupt noted plaintiff to experience partial response to Citalopram and instructed plaintiff to increase her dosage. Plaintiff was also instructed to increase her treatment visits to every two weeks. (Tr. 313.)

On April 30, 2009, plaintiff reported to Dr. Haupt that she felt much better with the increased dosage of medication and with her recent involvement in a class she was taking. Dr. Haupt counseled plaintiff regarding cognitive techniques to use to address thoughts and feelings she experiences when criticized. Mental status examination showed plaintiff to be smiling but also to be occasionally tearful. Plaintiff's flow of thought was noted to be good, as well as her insight and judgment. Plaintiff's mood was good and her affect was noted to be full and appropriate. Plaintiff was instructed to continue with Citalopram and to continue with her visits with Ms. Brown. (Tr. 313.)

Plaintiff telephoned Dr. Haupt on May 19, 2009, who noted plaintiff to be upset and tearful regarding her inability to find work. Dr. Haupt instructed plaintiff to take Trazodone. (Tr. 312.)

Plaintiff visited Dr. Haupt on May 21, 2009, who noted plaintiff to be tearful and to vent regarding the unfairness of her job and apartment situation. Plaintiff reported having increased thoughts of death, but had no suicidal ideation or plan. Mental status examination showed plaintiff to be alert, tearful and angry. Plaintiff's mood was noted to be terrible and her affect low.

Plaintiff's insight and judgment were noted to be fair.  Dr. Haupt diagnosed plaintiff with recurrence of depressive symptoms due to finances, and instructed plaintiff to continue with Citalopram for major depressive disorder.  Plaintiff requested that she be given Diphenhydramine[13] to help her sleep.  Plaintiff was instructed to follow up in one week.  Dr. Haupt noted that an attempt would be made to coordinate with a social worker to address plaintiff's depression and financial issues.  (Tr. 312.)

Plaintiff returned to Dr. Haupt on May 26, 2009, and complained of poor sleep with Diphenhydramine and requested that her medication be changed.  Mental status examination showed plaintiff to be alert, angry and appearing tired.  Plaintiff denied suicidal or homicidal ideation but expressed concern regarding her performance at a job interview that same day.  Plaintiff's flow of thought was noted to be coherent.  Plaintiff's mood was horrible and her affect was appropriate.  Plaintiff's insight and judgment were noted to be fair.  Dr. Haupt diagnosed plaintiff with major depressive disorder and insomnia due to finances and prescribed Quetiapine[14] for sleep.  Plaintiff was instructed to return for

---

[13]Diphenhydramine is used to treat insomnia.  <u>Medline Plus</u> (last revised May 16, 2011)<<u>http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682539.html</u>>.

[14]Quetiapine is used to treat the symptoms of schizophrenia, to treat or prevent episodes of mania or depression in patients with bipolar disorder, and to treat depression.  <u>Medline Plus</u> (last revised May 16, 2011)<<u>http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698019.html</u>>.

follow up in two days.  (Tr. 311.)

On May 28, 2009, plaintiff returned to Dr. Haupt who noted plaintiff to be doing much better.  Plaintiff reported that she was able to sleep and that she had good interviews.  Mental status examination showed plaintiff to be alert, pleasant and smiling.  Plaintiff's flow of thought was logical and coherent.  Plaintiff's mood was noted to be okay and her affect full and appropriate.  Dr. Haupt diagnosed plaintiff with major depressive disorder, doing well, and instructed plaintiff to continue with her current treatment inasmuch as she was responding well to such treatment.  Plaintiff was instructed to return for follow up in two weeks.  (Tr. 311.)

On June 12, 2009, plaintiff did not appear for a scheduled appointment with Dr. Haupt.  (Tr. 310.)

A script dated September 28, 2009, indicates that Dr. K. Sriram from St. Louis University Department of Neurology and Psychiatry prescribed Citalopram and Hydroxyzine[15] for plaintiff.  (Tr. 319.)

On October 9, 2009, plaintiff visited Dr. Sriram at SLUCare.  Plaintiff reported that her oldest son moved back with her and that he was not empathetic to her situation which resulted in anger.  Plaintiff reported having poor sleep and low mood.  It was

---

[15]Hydroxyzine is used for anxiety.  Medline Plus (last revised Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682866.html>.

noted that plaintiff worked part time. Plaintiff's current medications were noted to be Celexa and Hydroxyzine. Plaintiff reported that an increase in her dosage of Celexa did not help and that she experienced increased irritability. Mental status examination showed plaintiff to have logical thought processes. Plaintiff's mood was noted to be "not good" and her affect was depressed. Plaintiff denied suicidal or homicidal ideation and reported that she wanted to live for her children. Plaintiff's insight and judgment were noted to be good. Plaintiff was diagnosed with major depressive disorder, recurrent, moderate; and generalized anxiety disorder. Plaintiff was prescribed Abilify[16] and Ambien,[17] and relaxation techniques were encouraged. Plaintiff was instructed to return in four weeks for follow up. (Tr. 318.)

On November 17, 2009, Dr. Sriram completed a Mental Medical Source Statement (MMSS) in which he stated that plaintiff had been under his care since September 28, 2009. In the MMSS, Dr. Sriram opined that, in the domain of daily activities, plaintiff had marked limitations in her ability to cope with normal work stress, and moderate limitations in her ability to function independently and behave in an emotionally consistent manner. In the domain of

---

[16]Abilify is used with an antidepressant to treat depression when symptoms cannot be controlled by the antidepressant alone. Medline Plus (last revised May 16, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603012.html>.

[17]Ambien is used to treat insomnia. Medline Plus (last revised Aug. 15, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693025.html>.

social functioning, Dr. Sriram opined that plaintiff had moderate limitations in her ability to relate in social situations and to interact with the general public, and mild limitations in her ability to accept instructions, respond to criticism and to maintain socially acceptable behavior.  In the domain of concentration, persistence or pace, Dr. Sriram opined that plaintiff was moderately limited in her ability to perform at a consistent pace and to respond to changes in the work setting, and had no limitations in her ability to maintain attention to work tasks for up to two hours. Dr. Sriram opined that plaintiff had mild limitations in her ability to understand and remember simple instructions, make simple work-related decisions, sustain an ordinary routine without special supervision, and work in coordination with others.  Dr. Sriram opined that plaintiff's impairment would cause unpredictable work interruptions at least three times each month, with such interruptions lasting two to three days before plaintiff could return to work.  Dr. Sriram further opined that plaintiff's impairment would cause unpredictable late arrivals at work one to three times a month.  Dr. Sriram opined that plaintiff's impairment would cause her to be absent from work less than three days a month. Dr. Sriram stated that plaintiff's limitations have lasted or could be expected to last at least twelve continuous months, and that the symptoms of plaintiff's impairment vary in severity over time.  Dr. Sriram reported plaintiff's current diagnoses to be major depressive

disorder, recurrent, moderate; generalized anxiety disorder; and rule out bipolar disorder, type II.  Dr. Sriram noted plaintiff's current GAF score to be 60-69.[18]  (Tr. 320-23.)

## IV.  The ALJ's Decision

The ALJ found that plaintiff met the insured status requirements of the Social Security Act and would continue to meet them through December 31, 2013.  The ALJ found that plaintiff had not engaged in substantial gainful activity since November 30, 2008, the amended alleged onset date of disability.  The ALJ determined that plaintiff's major depressive disorder and generalized anxiety disorder constituted severe impairments, but that plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  The ALJ found plaintiff to have the RFC to perform a full range of work at all exertional levels, except that plaintiff could not perform more than simple, repetitive tasks in a low stress environment——defined as occasional decision making and occasional changes in the work setting.  The ALJ also found that

---

[18]A GAF score of 51 to 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  A GAF score of 61 to 70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.  Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000).

plaintiff could not have public contact and no more than occasional interaction with co-workers and supervisors. The ALJ found plaintiff unable to perform any of her past relevant work. Considering plaintiff's age, education, work experience, and RFC, the ALJ determined that there existed a significant number of jobs in the national economy that plaintiff could perform, such as mail clerk and linen room attendant as testified to by the vocational expert. The ALJ therefore found plaintiff not to be under a disability at any time since November 30, 2008. (Tr. 9-17.)

## V. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it

is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." <u>Coleman v. Astrue</u>, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." <u>Id.</u> (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the

claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Here, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff contends that the ALJ failed to properly evaluate Dr. Sriram's opinions, and erred by relying too heavily on the GAF score assigned by Dr. Sriram as a basis to reject his opinions. Plaintiff also claims that the ALJ erred by according more weight to the opinions of Dr. Cottone, a non-treating, non-examining physician, than to the opinions of Dr. Sriram, plaintiff's

treating psychiatrist, and Dr. Lipsitz, an examining consulting physician.

In evaluating opinion evidence, the Regulations require the ALJ to explain in the decision the weight given to any opinions from treating sources, non-treating sources and non-examining sources. See 20 C.F.R. §§ 404.1527(f)(2)(ii), 416.927(f)(2)(ii). The Regulations require that more weight be given to the opinions of treating physicians than other sources. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); see also Forehand v. Barnhart, 364 F.3d 984, 986 (8th Cir. 2004). This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

As such, evidence received from a treating physician is generally accorded great weight with deference given to such evidence over that from consulting or non-examining physicians. See Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992); Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1991).

Opinions of treating physicians do not automatically control in determining disability, however, inasmuch as the Commissioner is required to evaluate the record as a whole. Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007); Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004). The ALJ may discount or disregard such opinions if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). In addition, inconsistency with other substantial evidence alone is sufficient to discount a treating physician's opinion. Goff v. Barnhart, 421 F.3d 785, 790-91 (8th Cir. 2005).

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Such factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's

findings, and the treating physician's area of specialty.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Against this backdrop, the undersigned turns to plaintiff's claims that the ALJ erred in her analyses and the weight accorded to the opinions of Drs. Sriram, Cottone and Lipsitz.  For the following reasons, substantial evidence on the record as a whole supports the ALJ's decision regarding such opinion evidence.

A.    Dr. Sriram

In his written decision, the ALJ identified Dr. Sriram as plaintiff's treating psychiatrist (Tr. 14) and summarized the treatment provided by him to plaintiff in September and October 2009 and the opinions rendered by him in the MMSS completed in November 2009 (Tr. 12).  In making her disability determination, the ALJ stated that she gave consideration to Dr. Sriram's opinions but found them not to be entirely supported by objective evidence of record.  Plaintiff challenges this determination.

As an initial matter, the undersigned notes that, in her written decision, the ALJ considered the factors required by the Regulations when analyzing the medical evidence and opinion evidence obtained from Dr. Sriram.  The ALJ identified the treatment relationship between plaintiff and Dr. Sriram, Dr. Sriram's area of

specialty, and that Dr. Sriram had examined plaintiff on two occasions prior to rendering his opinion. The ALJ also looked to whether other evidence in the record was consistent with Dr. Sriram's opinion. (Tr. 12, 14.) Plaintiff's contention that the ALJ failed to consider the factors set out in the Regulations is without merit.

Although the ALJ identified Dr. Sriram to be plaintiff's treating psychiatrist, a review of her decision shows her not to have accorded controlling weight to the opinion expressed by Dr. Sriram in his November 2009 MMSS. In accordance with the Regulations, the ALJ gave good reasons therefore. First, the ALJ specifically noted that Dr. Sriram opined in the MMSS that plaintiff suffered marked limitations in coping with normal work stress but simultaneously assigned a GAF score of 60-69, which indicated mild to moderate mental functional limitations. The ALJ found these two findings to be inconsistent.[19] An ALJ is not compelled to give controlling weight to a treating psychiatrist's opinion that the claimant suffers extreme limitations where such opinion is "starkly inconsistent" with his finding that the claimant's GAF score indicates only moderate symptoms. See Goff, 421 F.3d at 791. In addition, a review of the MMSS shows additional inconsistencies,

_____

[19]A review of the MMSS itself shows Dr. Sriram to have opined that plaintiff suffered mild to moderate limitations in twelve of fourteen separate categories. The only category in which he found plaintiff to suffer marked limitations was in coping with normal work stress.

including Dr. Sriram's opinion that plaintiff's impairment would result in her absence from work less than three days a month, while simultaneously stating that her impairment would result in work interruptions more than three times a month with such interruptions lasting two or three days before plaintiff could return to work. Given such internal inconsistencies in Dr. Sriram's MMSS, the ALJ did not err in according the opinions therein less than controlling weight. See <u>Strongson v. Barnhart</u>, 361 F.3d 1066, 1071 (8th Cir. 2004) (not error for ALJ to discount those portions of Medical Source Statement which are inconsistent and unsupported); <u>Hogan</u>, 239 F.3d at 961.

Contrary to plaintiff's argument, the ALJ did not rely solely on the inconsistent nature of the GAF score in her determination not to accord Dr. Sriram's opinions less than controlling weight. The ALJ reviewed Dr. Sriram's opinions against the backdrop of the evidence contained in the record as a whole and determined the evidence not to support the entirety of Dr. Sriram's opinions. Nor did the ALJ "reject" Dr. Sriram's opinions outright as argued by plaintiff. Upon review of the evidence as a whole, the ALJ determined that plaintiff was *more* restricted than the GAF score assigned by Dr. Sriram, but not as severely restricted as he opined. (Tr. 14.) Indeed, the ALJ ultimately found plaintiff able to perform only those jobs which were limited to simple, repetitive tasks in a low stress environment with occasional decision making

and occasional changes in the work setting, no public contact, and no more than occasional interaction with co-workers and supervisors. Such limitations represent significant functional restrictions and support the conclusion that, contrary to plaintiff's assertion, the ALJ did not entirely reject Dr. Sriram's opinions. See Martise v. Astrue, 641 F.3d 909, 926 (8th Cir. 2011); Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).

Finally, the undersigned notes that the opinions rendered in Dr. Sriram's November 2009 MMSS were in the form of a checklist, did not cite to medical evidence, and provided no elaboration to support the opinions. Such vague and conclusory checklist assessments have limited evidentiary value. Even checklist "opinions" rendered by a treating physician deserve no greater respect than any other physician's opinion. Wildman v. Astrue, 596 F.3d 959, 965 (8th Cir. 2010); Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001); Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996).

Therefore, for all of the foregoing reasons, the ALJ underwent the proper analysis in considering Dr. Sriram's opinion evidence and did not err in her determination to accord less than controlling weight to the opinions expressed by Dr. Sriram in his November 2009 MMSS.

B.    Dr. Lipsitz

In her decision, the ALJ noted Dr. Lipsitz to have

assigned plaintiff a GAF score of 49, which indicates serious impairments in social and occupational functioning. The ALJ determined to accord Dr. Lipsitz's opinion no weight, however, finding that such opinion was inconsistent with the objective medical evidence of record, appeared to be based on plaintiff's subjective complaints, was inconsistent with the level of plaintiff's daily activities, and indicated limitations more restrictive than those opined by plaintiff's treating psychiatrist. (Tr. 14-15.) The ALJ did not err in this determination.

A review of Dr. Lipsitz's notes taken during plaintiff's evaluation shows plaintiff to have complained significantly of experiencing panic attacks two to three times a week during the previous two to three months; that she stayed home and slept a lot; that she had no energy; and that her interest in activities fluctuated. As noted by the ALJ, however, plaintiff's medications were generally effective when taken as prescribed (Tr. 14) and, indeed, a review of the medical evidence shows exacerbation of plaintiff's symptoms when she was not taking medication, including during the three-month period preceding plaintiff's visit with Dr. Lipsitz. While subsequently under the care of Dr. Haupt, plaintiff was noted to be doing well while taking her medication and undergoing counseling such that she was able to attend business college and participate in a work-study program twenty hours a week. In addition, the ALJ noted that plaintiff's daily activities

included preparing her children for school, shopping weekly, attending church, and attending to household chores (Tr. 14).

Considering the level of plaintiff's daily activities coupled with objective medical evidence of plaintiff's improvement with medication and counseling, the ALJ did not err in discounting the opinion of a one-time consulting physician that appeared to be based largely on plaintiff's subjective complaints.[20] See Wildman, 596 F.3d at 967; Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007); Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005). In addition, to the extent plaintiff argues that the ALJ's decision is itself inconsistent by crediting the already-discredited opinion of Dr. Sriram over that of Dr. Lipsitz, such argument is misplaced. As discussed supra at Section V.A, the ALJ did not "reject" Dr. Sriram's opinion outright as argued by plaintiff, but instead considered the opinion under the Regulations' standards. It was not error, therefore, for the ALJ to discredit Dr. Lipsitz's opinion as inconsistent with that rendered by plaintiff's treating

---

[20]Although plaintiff does not challenge the ALJ's credibility determination here, a review of the ALJ's decision nevertheless shows that, in a manner consistent with and as required by Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted), the ALJ thoroughly considered the subjective allegations of plaintiff's disabling symptoms on the basis of the entire record before him and set out numerous inconsistencies detracting from the credibility of such allegations. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992).

psychiatrist.  See Charles, 375 F.3d at 783 (opinions of one-time consulting physicians are generally not considered substantial evidence "especially if the treating physician contradicts the consulting physician's opinion.").

C.   Dr. Cottone

Finally, in her written decision, the ALJ "generally accept[ed]" the opinions of Dr. Cottone, the non-examining medical consultant who rendered his opinions upon the evidence of record. (Tr. 15.)  Plaintiff argues that it was error for the ALJ to credit the opinions of this non-examining state agency consultant over the opinions of examining physician Dr. Lipsitz and treating physician Dr. Sriram.  For the following reasons, the ALJ's determination to "generally accept" Dr. Cottone's opinions was not error.

With respect to the opinions of Dr. Lipsitz, the ALJ properly discounted such opinions for the reasons stated supra at Section V.B.  In addition, a review of the PRTF/Mental RFC Assessment completed by Dr. Cottone shows Dr. Cottone to have examined all of the evidence of record existing at that time with respect to plaintiff's impairments, including hospital records, function reports, third party reports, and personal interviews, and to have supported his opinion with findings based upon such evidence.  (Tr. 284.)  When evaluating a non-examining source's opinion, the degree to which the opinion considers all of the pertinent evidence in the claim must be considered.  Wildman, 596

F.3d at 967 (quoting 20 C.F.R. § 404.1527(d)(3)). The weight given
to an opinion from a non-examining source "will depend on the degree
to which they provide supporting explanations for their opinions."
20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3). "The better an
explanation a source provides for an opinion, the more weight we
will give that opinion." 20 C.F.R. §§ 404.1527(d)(3),
416.927(d)(3). Here, Dr. Cottone provided a thorough explanation
for the opinions rendered in the PRTF/Mental RFC Assessment and
cited to multiple sources of evidence in support thereof. In
contrast, Dr. Lipsitz's opinions were based on a one-time evaluation
conducted without the benefit of medical records, third party
interviews or other evidence of record. It was not error,
therefore, for the ALJ to "generally accept" the opinions expressed
by Dr. Cottone over those of Dr. Lipsitz.

To the extent plaintiff argues that the ALJ erred by
crediting Dr. Cottone's opinion over that of plaintiff's treating
psychiatrist, Dr. Sriram, plaintiff' argument is misplaced. The ALJ
specifically noted that Dr. Cottone's opinions were not given
controlling weight, but instead were considered as opinions of an
expert under the Social Security Act and found to be consistent with
and supported by the objective medical evidence of record. A review
of the ALJ's decision *in toto* shows that the ALJ considered Dr.
Cottone's opinion in addition to Dr. Sriram's opinion, and not
exclusive of it. Indeed, when compared to Dr. Sriram's checklist

MMSS, many of the conclusions reached by Dr. Cottone in his PRTF/Mental RFC Assessment regarding plaintiff's specific limitations are consistent with those made by Dr. Sriram.

A reading of the ALJ's decision in its entirety shows the ALJ to have considered all of the evidence of record and to have based her determination on her review of the record as a whole, and not solely on the non-examining consultant's opinions as plaintiff contends. Indeed, the ALJ specifically reviewed and considered the reports, notes and observations made by plaintiff's treating and examining physicians, non-examining consultants, hospital personnel, and third parties. Inasmuch as Dr. Cottone's opinions were consistent with such record evidence, the ALJ generally accepted them. This was not error.

## VI. Conclusion

Where there are conflicts in the evidence regarding the extent to which a claimant experiences limitations on account of her impairments, the resolution of such conflicts is for the Commissioner, and not the Court, to make. <u>Kirby</u>, 500 F.3d at 709; <u>Beasley v. Califano</u>, 608 F.2d 1162, 1166 (8th Cir. 1979). This is so even when physicians disagree and the medical evidence is in conflict. <u>Kirby</u>, 500 F.3d at 709; <u>Driggins v. Bowen</u>, 791 F.2d 121, 124 (8th Cir. 1986). As such, although a different position may be drawn from the evidence, the Court must affirm the ALJ's decision if it is supported by substantial evidence. <u>Goff</u>, 421 F.3d at 789;

see also <u>Tellez v. Barnhart</u>, 403 F.3d 953, 958 (8th Cir. 2005); <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001); <u>Briggs v. Callahan</u>, 139 F.3d 606, 608 (8th Cir. 1998); <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993).

In this cause, the ALJ evaluated the opinion evidence regarding plaintiff's mental ability to perform work activities and accorded the weight she deemed appropriate to such opinions, providing good reasons therefor. Because substantial evidence on the record as a whole supports such determination, the Court must affirm the decision. <u>Halverson v. Astrue</u>, 600 F.3d 922, 931 (8th Cir. 2010); <u>Heino v. Astrue</u>, 578 F.3d 873, 880 (8th Cir. 2009). <u>Goff</u>, 421 F.3d at 789.

Accordingly, for the reasons set out above on the claims raised by plaintiff on this appeal, the ALJ's determination is supported by substantial evidence on the record as a whole and plaintiff's claims of error should be denied. The decision of the Commissioner should therefore be affirmed.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed and plaintiff's Complaint is dismissed with prejudice.

Judgment shall be entered accordingly.



UNITED STATES MAGISTRATE JUDGE

Dated this _12th_ day of March, 2012.